**COMPLAINT FOR DAMAGES**

1



STEFFENY HOLTZ (SBN 177412)
LAW OFFICES OF STEFFENY HOLTZ
880 Apollo St., Suite 229
El Segundo, CA 90245
(323) 864-3227

Attorney for Plaintiff,
JEFFREY SIMONEK



# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV15-9190 - JAK (ASx)

| | |
|---|---|
| JEFFREY SIMONEK, <br><br> Plaintiff, <br><br> vs. <br><br> CITY OF EL SEGUNDO; EL SEGUNDO POLICE DEPARTMENT, MITCH TAVERA, Chief of Police of the El Segundo Police Department; ERIC ATKINSON; JANET GARZA; RAY GARCIA; JEFFREY HUMPHREY; GREG BURNER, KELLY BURNER, EL SEGUNDO SCHOOL DISTRICT, and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES** <br> 1. Violation of Civil Rights (42 U.S.C. § 1983) <br> 2. *Monell* Claim-Failure to Train (42 U.S.C. § 1983) <br> 3. *Monell* Claim-Failure to Supervise (42 U.S.C. § 1983) <br> 4. Conspiracy to Violate Civil Rights-Police Defendants (42 U.S.C. § 1985(2)) <br> 5. Conspiracy to Violate Civil Rights-Citizen Defendants (42 U.S.C. § 1985(2)) <br> 6. *Monell* Claim-School District Failure to Train (42 U.S.C. § 1983) <br> 7. Malicious Prosecution <br><br> **DEMAND FOR JURY** |





PAID
NOV 2015
25
Clerk, US District Court
COURT 4612

### COMPLAINT FOR DAMAGES
2

COMES NOW plaintiff JEFFREY SIMONEK ("Plaintiff") and for causes of action pleads, alleges, and avers as follows:

### JURISDICTION

1.     Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1343, (1), (2), (3) and (4). This action at law for money damages arises under 42 U.S.C. § 1983 and the United States Constitution, the laws of the State of California and common law principles to redress a deprivation under color of state law of rights, privileges and immunities secured to Plaintiff by said statutes, and by the Fourth, and Fourteenth Amendments.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

2.     Plaintiff JEFFREY SIMONEK is an individual residing in the County of Los Angeles, State of California.

3.     At all times alleged herein, Defendant MITCH TAVERA was and is the Chief of Police of El Segundo Police Department, City of El Segundo.

4.     At all times alleged herein Detective ERIC ATKINSON, Sgt. JANET GARZA, Lt. RAY GARCIA, Det. JEFFREY HUMPHREY, and DOES 1-20, inclusive and each of them were employees of the City of El Segundo ("CITY") and the El Segundo Police Department ("ESPD"). Defendant MITCH TAVERA is and all relevant times, the highest ranking law enforcement policymaker for CITY.

5.     Defendant CITY OF EL SEGUNDO  ("CITY") is and at all times herein mentioned has been a public entity and an incorporated county duly authorized and existing as such in and under the laws of the State of California; and at all times herein

COMPLAINT FOR DAMAGES

3

mentioned, Defendant CITY has possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting the operation of Defendant El Segundo City Police Department, (ESPD), their other operations and subdivisions presently unidentified to Plaintiff, their tactics, methods, practices, customs and usages related to internal investigations, personnel supervision and records maintenance, and powers of arrest.

6.      Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE is intentionally and negligently responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged. The true names and capacities of DOES 1 through 20, inclusive, and each of them, are not now known to Plaintiff who therefore sues said Defendants by such fictitious names and will be added to this action when their true names and capacities have been discovered.

7.      At all times alleged herein, each of the defendants was the agent and employee of each of the other defendants, acting in the course and scope of his agency and employment, and with the consent and ratification of his principal and employer.

8.      On October 27, 2015, Plaintiff JEFFREY SIMONEK was acquitted by a jury after a criminal indictment was filed against him, made public on December 13, 2013, that charged him with 20 counts of lewd acts on children (violations of Penal Code Section 288(a)). Said acquittal came after some 6 hours of jury deliberations following a criminal trial that lasted some 5 weeks. Plaintiff, an elementary school teacher teaching

**COMPLAINT FOR DAMAGES**

4

his first year and having no prior criminal history, remained jailed in the Los Angeles County Jail accused of being a serial pedophile during the entire pendency of the trial, unable to make the requested 20 million dollar bail.

9. Plaintiff had been a first year, full time school teacher at Center Street Elementary School in El Segundo, assigned to teach 5th grade for the 2011-2012 school year, approximately between September 7, 2011 and June 21, 2012, having worked his way up through the same school and district from a teacher's aide in 2007. At no time was Plaintiff ever made aware of any complaints against him alleging he committed any lewd act upon a child at the school or elsewhere. At all times, Plaintiff performed in conformity with the habits, customs and practices of mentor teachers and colleagues as they instructed him. Plaintiff is male and at all times his conduct was of the same quality as the female teachers. His conduct as concerned physical contact with students was the same as the female counterparts. At no time was any female teacher complained about for engaging in the same type of physical proximity to children as had Plaintiff.

10. Defendants, and each of them, did the acts and omissions, hereinafter alleged, in bad faith, with reckless indifference to Plaintiff's clearly established constitutional rights under state and federal constitutional law, and with knowledge that their conduct violated clearly established and settled law.

The False DCFS Complaint & the Suppression of the Exonerating Evidence

11. On August 2, 2012, Defendant police officers commenced an investigation of an anonymous complaint made on August 1, 2012 to Department of Children and

**COMPLAINT FOR DAMAGES**

5

Family Services (hereafter "DCFS Complaint") of allegations that Plaintiff had touched students inappropriately, to wit, "drawing young boys into his lap, open legs, massaged necks or otherwise touched student for no reason." The allegation also stated that Plaintiff had taken a "particular liking to a male student as evidenced by eating lunch with him alone, going to the child's sporting events unannounced and uninvited, and parking outside of the child's home" A second complainant in the same DCFS call reported witnessing Plaintiff touch a 7 year old boy inappropriately in rubbing the boys back and buttocks over his clothing, and that Plaintiff had put his nose close to the boys' nose and rubbed noses with the boy.

12.    Shortly thereafter in or about August, 2012, Defendant HUMPHREY identified the apparent subject of that part of the complaint involving Plaintiff eating lunch, attending sports events and being at the child's home as JOSH PALMER.

13.    On or about September 11, 2012, Defendant HUMPHREY and Defendant SGT. GARZA conducted a surreptitiously tape recorded audio interview of JOSH PALMER wherein JOSH PALMER provided exculpatory information, to wit, that he had "no concerns about [Plaintiff] at all." JOSH PALMER told defendants HUMPHREY and GARZA that he was acquainted with Plaintiff from his and other friends being in Plaintiff's before school math intervention class during which Plaintiff had brought all the students, including females, breakfast. JOSH PALMER further explained that Plaintiff had been driving down PALMER's street on his way to the local high school from the elementary school, that PALMER observed students walking for a field trip and

that it was "normal" for Plaintiff to be on his street where Plaintiff was attending the field

trip. PALMER further explained that Plaintiff had eaten lunch with PALMER on campus

of the elementary school because PALMER had been having a really rough time.

PALMER related to the defendants HUMPHREY and GARZA that nothing that Plaintiff

ever said had made him feel uncomfortable; that Plaintiff had never touched him

inappropriately.

14.    Despite having interviewed Josh Palmer who was one of the two subjects of

the DCFS complaint, Defendants HUMPHREY and his direct supervisor Defendant

GARZA intentionally suppressed that they had interviewed Josh Palmer; failed to

indicate in any police report that they had interviewed Josh Palmer and never provided

the exculpatory tape recorded audio interview of Josh Palmer until September 25, 2015,

some 10 days after the commencement of Plaintiff's criminal trial.

15.    Further respecting the DCFS complaint, on August 16, 2012, Defendants

HUMPHREY and GARZA met with and interviewed and surreptitiously tape-recorded

their audio interview of Ann Leonard, a 5th grade colleague of Plaintiff, in which she

provides exculpatory evidence of the innocent circumstances by which Plaintiff came to

be in the presence of Josh Palmer. Defendants HUMPHREY and his direct supervisor

Defendant GARZA suppressed that they had interviewed Ms. Leonard on tape; failed to

indicate in any police report that they had interviewed Ms. Leonard on tape, and never

provided various exculpatory tape recorded audio interview statements contained therein

until September 21, 2015, some 6 days after the commencement of Plaintiff's criminal

trial, and some three years and one month after the interview.  Thus, the grand jurors were deprived of critical exculpatory and material information as to the motivations of the witnesses who testified at the grand jury.  In particular, Ms. Leonard told Defendants HUMPHREY and GARZA that she had indicated she had disclosed to her colleague, "Valerie [Sandowicz], the other 5th grade teacher, that her student Josh Palmer had been having a rough time, and critically, that Ms. Sandowicz told Ms. Leonard that Sandowicz told Plaintiff that he should reach to Josh Palmer." Further, Defendants failed to include the identity of Valerie Sandowicz, and thus grand jurors were deprived of critical exculpatory information and witness information. Moreover, this information was withheld from Josh Palmer's mother, who was left to believe that Plaintiff had without explanation had lunch with her son, which had the effect of misleading other witnesses, including Josh Palmer's mother and the grand jurors. The interview of Ann Leonard further reveals an improper pattern of providing investigation information and factual information, and opinions to potential witnesses, with the result of and creating bias, and in turn influencing the resulting witnesses' information and affecting the integrity of their statements.

Police Use Improper Tactics, Create Hysteria, & Suppress Tapes of Such

16.    On August 2, 2012, Defendant HUMPHREY received information that potential witnesses were going to contact other potential witnesses.  HUMPHREY failed to request contact information himself and make the contact information himself thereby knowing and failing to protect the integrity of his investigation.  Defendant CITY knew

and acted with deliberate indifference to the clearly established due process rights of Plaintiff in nonetheless permitting Defendant HUMPHREY to conduct an active investigation without proper training. By HUMPHREY's actions, he knew that witnesses were cross-contaminating and failing to protect defendant's right to a fair and untainted investigation.

17.     Detective HUMPHREY and GARZA expressed in a tape recording apparently inadvertently left running that they were aware that if the "teachers start talking, their perceptions would be swayed; that teachers might start thinking they would remember something that you really don't…because somebody told you so" Therefore, Defendants consciously disregarded the serious and obvious risk of cross-contaminating witnesses, thereby distorting their memories and testimonies. Further, these defendants injected opinion and information about what other witnesses had said, with the obvious consequence of creating a bias, influencing the testimony of such interviewed witness.

18.     Detective HUMPHREY and GARZA employed improper police tactics, when they expressed to Ann Leonard that because "these behaviors you're describing and a lot of people are describing…we consider grooming behaviors, potentially, not saying he is, but getting to know families, you know, …putting his hands on them, inappropriate." This constituted a violation of standards of interviewing children provided to the police by a consulted Child Interview Specialist Nicole Farrell on August 16, 2012.

**COMPLAINT FOR DAMAGES**

9

19.     Defendants influenced ETHAN B. to change his testimony, from previously denying being touched on the buttocks or private parts by Plaintiff., by telling him, in essence, that something had happened that he should now divulge such, in contravention of police standards and in violation of instructions from the Police Department's child-interview specialist. Thereafter, Ethan B. indeed did change his testimony at the grand jury, without any notice by Ethan B. or his parents to authorities.

20.     Defendants HUMPHREY and GARZA, Defendant LT. RAY GARCIA, Defendant MITCH TEVERA and other police officers, caused a false press release to be published. In particular, on or about October 14, 2015, Plaintiff first learned enough facts to know that the press release issued on October 24, 2012  contained falsified information designed to improperly influence and bias potential witnesses and to prejudice them and the public that Plaintiff was in fact guilty and had committed criminal acts against minors.  This was a pattern and practice in effect at the El Segundo Police Department, which, it then learned, infected the entire investigation, including but not limited to numerous statements made to possible witnesses during purported "interviews" presumably to determine facts.

21.     Thereafter, Defendants similarly injected false and conclusory statements concerning and directly impacting the integrity of statements obtained of percipient witnesses that necessarily impacted the objectivity of statements and which methodology was necessarily exculpatory and impacted the grand jury findings, depriving Plaintiff of his constitutionally protected right to due process and fair trial.  Had this exculpatory

**COMPLAINT FOR DAMAGES**

10

information been provided, the grand jury result would have been different, that is, favorable to Plaintiff.

<u>Det. Humphrey's Maintaining an Archive of Undisclosed Tape Recordings.</u>

22.     Respecting prosecution witness Ethan B., who testified at the grand jury hearing that Simonek touched his private parts and buttocks and made him feel uncomfortable, defendants HUMPHREY and GARZA failed to disclose an audiotape in which Ethan B. contradicts the former statement and explains the latter. In particular, on or about August 29, 2012, said Defendants met with witness Ethan B. and conducted an interview, which was surreptitiously audiotaped. This witness stated he was not touched in the buttocks or genital area, but yet, said tape was provided to neither the prosecutor nor to Plaintiff's criminal counsel, until September 26, 2015, some eleven days after the commencement of Plaintiff's criminal trial (some 37 months after the meeting). Defendants intentionally and purposefully concealed this information from the prosecutor so that the grand jurors were deprived of constitutionally mandated exculpatory information, and thereby deprived Plaintiff of due process and a fair trial. In withholding said audiotapes from the defense, said Defendants caused the additional deprivation of said constitutional rights by failing to disclose that Ethan B. also stated that a he had had "a lot of teachers" who had made him feel uncomfortable, and by not disclosing evidence of this witness's motive against Mr. Simonek, namely, that he felt Mr. Simonek did not like him because he got in trouble a lot.  This motivation was known to Defendant HUMPHREY and GARZA from Ethan B.'s mother (Kelly B.) whom they interviewed

immediately after Ethan B., and also audiotaped and similarly did not provide.  Moreover,

Kelly B. claimed to have email correspondence between her family and Plaintiff to

explain the conflict between them, but Defendant GARZA specifically requested to not

receive said correspondence and evidence from Kelly B.  Crucially, said motivation was

never disclosed to the grand jurors.

23.     Respecting Peggy Malpee, a teacher, who claimed that Plaintiff touched

students inappropriately, Defendant HUMPHREY failed to disclose audio tapes showing

her anti-gay bias. In particular, August 9, 2012, HUMPHREY received a call from

Malpee, a person he knew to have been the wife of a prosecution witness from the

infamous McMartin Preschool Case and who Defendant HUMPHREY knew harbored

tremendous biases against gay persons.  Malpee disclosed to Defendant HUMPHREY

that she was one of the anonymous callers of the DCFS complaint. Moreover, Defendants

HUMPHREY and GARZA failed to disclose Malpee's admission that she had been

unaware of an allegation that Plaintiff touched a child's buttocks until the placing of the

DCFS with her colleague.  These various exculpatory recorded statements were never

disclosed until September 21, 2015, some 6 days after the commencement of Plaintiff's

criminal trial.

24.     Respecting teachers who associate with Malpee, who likewise claimed the

Plaintiff touched students inappropriately, Defendant HUMPHREY also failed to disclose

audio tapes showing their anti-gay bias. In particular, over the month of August, 2012,

HUMPHREY conducted various interviews of Malpees's colleagues, all of which

interviews were surreptitiously audiotaped. Despite having interviewed teacher colleagues Joannie Bowdre, Margie Lynch, Ramona Millar, Pamela Honner-Licht, Joan Moon, Rashell Lemay, and others, Defendant HUMPHREY and his direct supervisor Defendant GARZA intentionally suppressed that they had interviewed these persons on tape and that they had audiotaped recordings of the tapes; failed to indicate in any police report that they had interviewed said witnesses on tape, and never provided various exculpatory taped interview statements until September 21, 2015, some 6 days after the commencement of Plaintiff's criminal trial. In consequence, Defendant HUMPHREY and SGT. GARZA knew that there was a pattern of bias and dislike motivating the colleagues against Plaintiff because he was a gay male. None of this was disclosed to Plaintiff or to the Prosecutor and thus went undisclosed to the grand jurors who presided over the indictment proceedings. Thus, the grand jurors were deprived of critical exculpatory and material information as to the motivations of the witnesses who testified at the grand jury.

25.    Respecting Joan Moon, who testified that Plaintiff touched certain boy students which made them feel uncomfortable, Defendant HUMPHREY and GARZA failed to disclose the existence of exculpatory taped interviews. In particular, on or about August 13, 2012, they met with witness JOAN MOON. Said meeting was surreptitiously tape recorded and audiotaped. Said tape was not provided to the prosecutor or to Plaintiff's criminal counsel until September 21, 2015, some 37 months after the meeting and some six days after the commencement of Plaintiff's criminal trial. Ms. Moon provided information that showed that Plaintiff did not focus or favor on boys, did not

**COMPLAINT FOR DAMAGES**
13

target vulnerable special needs kids; and, told Defendants that she never observed Plaintiff touching any other part of children's bodies other than shoulder.

26.     Respectiing Pamela Honner-Licht who testified to observing Plaintiff's interactions with children on the playground, Defendant HUMPHREY and GARZA failed to disclose the existence of exculpatory taped interviews.  In particular, on or about August 16, 2012, they met with witness PAMELA HONNER-LICHT.  Said meeting was surreptitiously tape recorded and audiotaped.  Said tape was not provided to the prosecutor or to Plaintiff's criminal counsel until September 21, 2015, some 37 months after the meeting and some six days after the commencement of Plaintiff's criminal trial.  Ms. Honner-Licht provided information that showed that Plaintiff was enthusiastic, was good with the kids, that he roughhoused in a playful way, that kids loved him.  Defendants HUMPHREY and GARZA were informed again of rumors and speculation amongst colleagues about Plaintiff's sexual orientation "he was clearly…I shouldn't even say this "Preferred the boys to the girls.  He likes the boys!"  Defendants further stated that she thought she told Plaintiff to not be alone in a room with a child.  She didn't feel he was targeting kids in her class, nor did she ever hear Plaintiff make comments about childrens' clothes or looks.  Finally, she told Defendants that she had never heard any teachers say that they had seen Plaintiff touch the butt or genitals of kids over their clothes, only rub shoulders or back.  She had no other concerns and he never targeted special ed kids.

27.     Respecting charges relating to Mark C. and Garett C., concerning body checks for ticks, Defendants also failed to disclose exculpatory photographs. On or about October 14, 2015, Defendant GARZA was called as a witness in the defense case in Plaintiff's criminal trial.  During her testimony and during the break during her examination, she revealed that she had received and was in possession of photographs of the subject location where the alleged tick checks had occurred since her receipt of them on November 14, 2012.  Although, the photographs of the cabin were exculpatory, they were not provided to the prosecutor or to Plaintiff's criminal counsel until October 14, 2015, some 35 months after she had come into possession thereof and not provided to Plaintiff until the defense portion of the criminal trial. Defendant HUMPHREY too was in receipt of the photographs and similarly failed to report and disclose his possession of the photographs.

28.     Respecting witness Kelly B. and Greg B., who testified that Ethan B. told them that he, Ethan, had been touched on private part by Plaintiff, Defendant HUMPHREY failed to disclose a tape recording revealing these witnesses' bias having arisen against Plaintiff before any accusation of sexual misconduct. In particular, on August 29, 2012 Defendant HUMPHREY and GARZA interviewed witness Kelly B., and surreptitiously tape recorded and audiotaped the interview.  Said tape was not provided to the prosecutor or to Plaintiff's criminal counsel until September 26, 2015, some 37 months after the meeting and some eleven days after the commencement of Plaintiff's criminal trial. This failure misled the grand jury to believe that this child

**COMPLAINT FOR DAMAGES**
15

witness was without motive to lie and thus the failure was a substantial factor in bringing

about the indictment on the count concerning this child. In particular, Kelly B., mother of

the last-stated minor, revealed to Defendants that she still had email correspondence

exchanged between her family and Plaintiff concerning her son's classroom misbehavior,

that her son was "absolutely furious" at Plaintiff, and that this mother instructed Plaintiff,

"I don't want you to ever, ever, talk to my child again." Furthermore, this tape recording

was exculpatory as showing HUMPHREY as improperly influencing Kelly B. by

creating further bias against Plaintiff, thus encouraging inaccurate or untruthful

information. The tape recording is still further exculpatory in showing HUMPHREY

violating police standards against making statements which create a risk of leading a

witness to believe that she is helping the police by fabricating and the risk of cross-

contamination; which HUMPHREY did, when he relayed hearsay innuendo to Kelly B.,

with such statements as: "You guys may want know about some of these incidents that

have occurred…some of these concerns have been brought up and …" "A lot of stuff like

that's coming up.  Just stuff that makes you go, 'Eh…that doesn't sound right.'"  "We'll

sit him down and tell him, 'Hey, this touching of kids has gotta stop.'"

     29.     Respecting witness Rashell Lemay, who could testify as to Danny B., one of

two subjects of the DCFS report, Defendants failed to disclose exculpatory audiotapes. In

particular, on August 16, 2012, Defendant HUMPHREY and GARZA met with witness

Rashell Lemay. Said meeting was audiotaped, but the tape was not provided to the

prosecutor or to Plaintiff's criminal counsel until September 21, 2015, some 37 months

**COMPLAINT FOR DAMAGES**

16

after the meeting and some six days after the commencement of Plaintiff's criminal trial. This witness provided the information regarding the true relationship of Plaintiff to Danny B. and his family.

30.     Respecting a potential witness, a mother of Danny B., subject of one of the two above-referred to DPFS reports, who could testify that Simonek taught and tutored her child, and wanted to nominate him for teacher of the year and also wanted her child reassigned to Plaintiff's class for the upcoming school year, defendant HUMPHREY recorded her interview, but hid the recording. The recording was not provided to defense counsel until September 21, 2015, during the jury trial. Instead, this Defendant caused the grand jurors to believe that SIMONEK was going out of his way on his own to approach this Danny B, rather than his mother seeking Plaintiff. Further, although, this information was provided by teacher Ms. Lemay, it was not put in the police report. And, although Ms. Lemay's provided written notes to this Defendant, as reflected in said tape recordings, these not provided to the defense.

31.     Respecting the grand jury counts concerning Mark C. and Garett C. and their being the subject of the tick check of their bodies, Defendant HUMPHREY failed to disclose the following exculpatory information in his possession: that the director of the summer camp, nurse Erica Stein, personally observed the Plaintiff conducting tick checks of campers; that there was nothing unusual she observed; and that she instructed that younger campers needed the assistance of counselors in this regard. Thus, this failure misled the grand jury to believe that Plaintiff initiated the tick checks for sexual purposes,

which likely was a substantial factor in causing the indictment on these counts. Further

regarding these recordings, Defendants HUMPHREY and GARZA failed to disclose that

Mark C's mother relayed an impeaching statement, on October 26, 2012 but not disclosed

until September 24, 2015, from Mark C.'s that Mark expressed that Plaintiff had not

touched his bottom, and other prior inconsistent statements which failure further

contributed to misleading the grand jury and to the indictment on these counts.

32.    Respecting the count involving Sebastian B., also a subject of the DCFS

complaint, Defendants failed to disclose video tape recording of Sebastian B. himself,

which shows that Plaintiff did not touch him on the buttocks, did not encircle him and rub

his stomach nor made him feel otherwise uncomfortable and failed to disclose other

evidence showing the DCFS complaint false.

33.    Also, pertaining to indictment count concerning Sebastian B., and witness

Joanie Bowdre, Defendants failed to disclose her tape recording until trial, causing the

trial court to hold a hearing to determine bad faith, leading to a finding that the

prosecution withheld the evidence to gain a tactical advantage, and resulting the court

striking her testimony as a sanction. Moreover, Defendants failed to disclose having

taken Sebastian for interview at Stuart House for a videotaped interview which was  not

revealed until October 2, 2015, some three weeks after trial had begun and which was not

revealed in a police report, to the prosecutor nor to the grand jurors for their

consideration.  Said recording of Sebastian B. was entirely exculpatory; it impeached the

statements of Lynch and Bowdre regarding this count.  In this regard, Defendants

**COMPLAINT FOR DAMAGES**
18

HUMPHREY and GARZA failed to reference, summarize or otherwise identify that

Sebastian B. was interviewed on or about September 26, 2012 and was not disclosed

34.   Respecting the information about Danny B., on August 22, 2012, teacher

Scaltrito, testified to inappropriate touching, but this witness reported to Defendants

exculpatory information that was not provided in the police report.  Her audiotaped

interview was not provided until September 21, 2015.  The tape revealed that Danny B.'s

family loved Plaintiff and sought him out; it refuted that Plaintiff did not initiate contacts

with this child, did not seek him out, and did not prey on this child. In particular, Scaltrito

told Defendants GARZA and ATKINSON that teacher Sabrina Reily "hooked Danny up

with Mr. Jeff to help him through his, his rough periods" and in other words explicitly

told the officers that Danny B.'s family would not aid in their quest to charge Plaintiff.

Yet, Defendants failed to disclose this to the grand jury and allowed the impression to be

made that Defendant initiated and sought out Danny B. to go forward without the

exculpatory evidence. In regards to Scaltrito's testimony of alleged inappropriate

touching, the Defendants failed to reveal Scaltrito's gay animus, failed to disclose that

Scaltrito attempted to use her union position to influence potential jurors, thus allowing

her testimony to be considered by the grand jury without the exculpatory evidence. The

recording also failed to reveal Scaltrito's prior interactions and professional relationship

with HUMPHREY.

34.   Respecting the grand jury indictment on counts concerning Mark C. and

Garrett C. and their having allegedly been the subject of an improper body check for

ticks, defendants HUMPHREY and GARZA failed to disclose the existence of tape recordings showing interviews of percipient witnesses Mason Y., Cole B. and Roman S. who had exculpatory information showing the tick checks were also performed by other counselors and that Plaintiff performed the tick check in a routine manner. In particular, on or about November 5 and 6, 2012, Defendants met with these witnesses. Witness Roman S. in particular stated that campers' pants would stay up during tick checks and that Plaintiff could not see his "privates" during the checks. He further also stated that nothing "weird" happened during the shower parties. Said meetings were tape recorded and audiotaped. Said recordings were not provided to the prosecutor or to Plaintiff's criminal counsel until September 26, 2015, some 34 months after the meeting and some eleven days after the commencement of Plaintiff's criminal trial. The failure to disclose this information resulted in the grand jury being misled to believe that Plaintiff initiated the tick check for sexual purposes, thus causing the grand jury indict Plaintiff on these counts. And, in failing to differentiate the two allegations, the Defendants permitted the misuse by the grand jury of the information to find a sexual purpose in each to corroborate or substantiate the other as between the Garrett C. allegations and the Mark C. allegations.

35.    The grand jury heard testimony in November, 2013 from various witnesses that Plaintiff had allegedly had inappropriate contact motivated by a lewd intent with campers in his care during shower parties at Walton's Grizzly Lodge. However, on November 7, 2012, Defendant HUMPHREY and GARZA had met with witness

## COMPLAINT FOR DAMAGES
20

GARRETT C. and his mother. Said meeting was surreptitiously taperecorded and audiotaped and included the following assertions by Garrett C. to DEFENDANTS HUMPHREY and GARZA:

-he thought he was there to speak to the police "because there was a guy at the camp doing something wrong to kids". Despite having this information, Defendants made no inquiry of the source of such hearsay or its potential impact on the interview. He said that he knew that the person he was to speak about was Plaintiff.

-Plaintiff would check around the waist for ticks and pull out his pants a little bit and take a quick look down. Campers would line up in the middle of the cabin to wait for this to occur. If campers had already brushed their teeth after the check, then they would sit in bed, or brush their teeth if they hadn't yet done so. The tick checking occurred after campfire.

-during shower parties counselors helped to put shampoo or soap on campers backs, where they couldn't reach. During shower parties, counselors would be monitoring the campers. It was regular for all the counselors to do this.

Neither reference to nor the content of the surreptitiously recorded tape was included in any police report, nor provided to the prosecutor, and was not therefor adduced to the grand jury nor provided to Plaintiff's criminal counsel until September 26, 2015, some 37 months after the meeting and some eleven days after the commencement of Plaintiff's criminal trial. Defendants intentionally and purposefully concealed this audiotape and its exculpatory content from the prosecutor so that the grand jurors were

**COMPLAINT FOR DAMAGES**

21

intentionally deprived of constitutionally mandated exculpatory information, and thereby due process and a fair trial all of which undermines the confidence in the outcome of the grand jury.

36.     The grand jury heard testimony in November, 2013 from Victor K. that Plaintiff had touched his penis while in front of his class full of students and several instructional aides; and also heard testimony from Ethan B. that Plaintiff had touched his penis while in front of the same class but on a different day; and from Gavin but not that his penis was touched.   However, on October 30, 2012, Defendant HUMPHREY monitored an interview he arranged between Matthew G. and child interview specialist Nicole Ferrell at Stuart House.   Said meeting was videotaped, and included the following assertions by MATTHEW G.:

-that Victor K. had told him that he didn't like Plaintiff and Matthew G. knew this by the fact that in class, Victor K. and Ethan B. mistreated Plaintiff by making it hard for him to teach and that Plaintiff would just keep going.  Despite this information, neither Defendant HUMPHREY nor Defendant GARZA made effort to interview or otherwise investigate whether Ethan B. and/or Victor K. made trouble for Plaintiff in the class or whether they were motivated by personal animus toward Plaintiff, despite that Matthew G. stated that a lot of people who were in his class were talking about it.  "Ethan B., David B., Victor K., Gavin L. were all talking about it.  They're saying "did he do it or not?"  I" can't believe he got arrested" according to witness Matthew G.

**COMPLAINT FOR DAMAGES**
22

-that Victor K. Ethan B., Gavin L. and Fabian G. stated that those three boys went to study hall, supposedly Victor K., Gavin L., Ethan B. and Fabian G.. They said it happened then.

-that he didn't know which "side" to go on, whether it happened or didn't

-that Victor K. said Plaintiff was arrested because he (Victor K.) had told his parents and the police.

-that Fabian G. said that it had happened to him and four other boys (Fabian G., Gavin, L. Victor K. and Ethan B.) and he didn't know if it was true or not.

-that FABIAN had brought it up to Matthew G. "did you hear about Mr. Simonek being arrested?...Well do you know what happened to him and Fabian G. brought it up that it was him and the three other boys."

-that Matthew G. stated that he told Fabian G. that it couldn't have been them because two were allegedly the ones, and Fabian said it was "us four." Fabian G. told Matthew G. that he was at the police station the night before.

-that Matthew G. stated that nothing in Plaintiff's class made him feel uncomfortable.

-that Plaintiff's's hands didn't go anyplace, they were on the side when he was on his lap (as solicited by the interviewer).

Neither reference to nor the content of the surreptitiously recorded tape was included in any police report, nor provided to the prosecutor, and was not therefor adduced to the grand jury nor provided to Plaintiff's criminal counsel until August, 2015,

**COMPLAINT FOR DAMAGES**

23

some 34 months after the meeting.  Defendants intentionally and purposefully concealed this audiotape and its exculpatory content from the prosecutor so that the grand jurors were intentionally deprived of constitutionally mandated exculpatory information, including prior inconsistent statements, evidence of cross-contamination and rumor mongering, and thereby deprived Plaintiff of his due process rights and a fair trial all of which undermines the confidence in the outcome of the grand jury proceeding.

37.    The grand jury heard testimony in November, 2013 from Defendant HUMPHREY that he had received an anonymous DCFS complaint (uttered by Witness Scaltrito) alleging that Plaintiff had touched the butt of a child investigated to allegedly be SEBASTIAN B.  On the subject of Sebastian B., the grand jury was presented with the witnesses Joannie Bowdre, Margie Lynch and Defendant HUMPHREY that Plaintiff did NOT touch the butt of Sebastian B., but rather that Plaintiff had encircled Sebastian in Plaintiff's legs while Plaintiff sat on a wall and rubbed Sebastian's stomach.

However, on or about September 16, 2012,  Defendant HUMPHREY monitored an interview he arranged between Sebastian B.. and child interview specialist Nicole Ferrell at Stuart House. DEFENDANTS did not disclose the fact that they had caused Sebastian B. to be interviewed at Stuart House, nor that they were in possession of a video of the interview, nor the contents or substance of the interview until October 2, 2015 in trial. The following assertions were made by Sebastian B. in the aforementioned concealed videotaped Stuart House interview.:

-that Plaintiff had never been touched on his private parts;

**COMPLAINT FOR DAMAGES**
24

-that during "reading buddies", Plaintiff would "sneak" up and "scare" him while Sebastian was on the play equipment, that it felt like nothing, like a bee sting;

-that Victor K. had been one of his reading buddies;

-that Plaintiff and Ms. Bowdre would watch the students during reading buddies to make sure that they didn't misbehave;

-that Plaintiff would be talking to his teacher during reading buddies—Ms. Bowdre; that Plaintiff didn't talk to the kids during reading buddies;

-that there was NEVER a time when Mr. Simonek's hands touched Sebastian B. on his body, nor when Plaintiff was talking to him, nor on his shoulder or something else;

-that there was never anything that happened during reading buddies that Sebastian B. didn't like or that made him or his "tummy" feel nervous.

-Sebastian B. was specifically asked if anyone ever touched his bottom before and he said no; and that none had ever touched a private part of his body or any touches that made him feel uncomfortable.

There is no reference in the police report anywhere of any interview or contact with Sebastian B. The police report states only that DEFENDANTS met with Sebastian B.'s. parents on August 16, 2012 and advised them of the allegation that he may have been touched on the butt. Sebastian B.'s parents stated they would like to talk it over before allowing an interview at Stuart House. As of the "date of this report" (which date was no later than the date report was printed, on October 2, 2012)

**COMPLAINT FOR DAMAGES**
25

Sebastian B.'s parents had not given permission for such an interview. The report was approved on September 28, 2012. However, at grand jury, DEFENDANT HUMPHREY testified he spoke to Sebastian B. on September 26, 2012. DEFENDANT HUMPHREY testified only that Sebastian B. did not reveal that he was uncomfortable with Plaintiff.

The videotaped interview of Sebastian B. at Stuart House was not provided to the prosecutor, nor to Plaintiff's criminal counsel until October 2, 2015, some alleged 3 years after the interview had occurred and some 17 days after the commencement of Plaintiff's criminal trial. Defendants intentionally and purposefully concealed this information from the prosecutor so that the grand jurors were intentionally deprived of constitutionally mandated exculpatory information, and thereby due process and a fair trial. Grand Jurors submitted various questions concerning Sebastian B. and thus confidence in the outcome of the verdict of the grand jury is necessarily undermined.

DEFENDANTS knew that the prosecution sought an indictment on the Sebastian B. count and intentionally and purposely failed to disclose the existence and content of the exculpatory videotape and statements made therein in any police report. In so doing, DEFENDANTS intentionally presented misleading information to the grand jury. Meanwhile, following the testimony of Joanie Bowdre the sole trial witness to substantiate the Sebastian B. count in Plaintiff's criminal trial, the trial court struck the testimony of Ms. Bowdre due to the late disclosure of the Sebastian B. Stuart House interview as having been intended to gain a tactical advantage over the defense.

COMPLAINT FOR DAMAGES
26

Allegations by Mark C. and Garrett C. cross-corroborated each other to show Plaintiff acted with lewd conduct-Defendants HUMPHREY and GARZA intentionally misled, falsified and suppressed exculpatory information; their acts permitted unchallenged evidence to influence the grand jury (that the Garrett C. "waistband pullings" were lewd because of the Mark C. touchings could be implied; and that the Mark C. touching(s) were lewd could be implied from the "waistband pullings"—by not bringing the impeaching witnesses, the allegations went unchallenged and the jury was deprived of the true picture of the weight of the testimony altogether pertaining to the tick checks at Walton's that were authorized.

38.     The grand jury heard testimony in November, 2013 from Mark C. that he was in Plaintiff's assigned cabin at Walton's Grizzly Lodge when he claimed Plaintiff ordered him to pull his pants down and his underwear down and thereafter touched his penis and his butt.  Prosecution indicted Plaintiff for 2 counts of 288(a), one for the alleged touching of Mark C.'s penis and one for the alleged touching of his butt.  On January 2, 2013, Defendant HUMPHREY monitored an interview he arranged between Harrison K. and interviewer Christine from Dallas Advocacy Children's Center.  Said interview was videotaped.   Said tape was not provided to the prosecutor, nor to Plaintiff's criminal counsel until August, 2015, a month and a half prior to trial was to begin.  HARRISON K. was a camper in Plaintiff's group in the same cabin as Mark C.  The following assertions were made by Harrison K.:

**COMPLAINT FOR DAMAGES**
27

-Harrison K. stated that he was at the interview because his mom told him that a lot of people in his camp cabin were complaining that his camp counselor was being inappropriate with a bunch of them; that he got arrested for mosquito checks; that he now works at a school and that those kids talked about their being inappropriate with them. This is further example of DEFENDANT'S repeated violation of proper standards and tactics for proper interviewing of child witnesses to preserve the integrity and to avoid cross-contamination and bias during the interview process itself.

-Harrison K. stated that Plaintiff didn't seem inappropriate towards Harrison K.

-Harrison K. described that Plaintiff did checks for mosquitos or bumps on the legs, but that it felt like he was just doing his job, like trying to be safe and all that.

-Harrison K. said that he didn't know that other kids were complaining about it.

-Harrison K. stated that you would get in a line, and if you had a bump, he checked your legs up to the knee, rubbing to see if there was any bumps. If there were, he would walk over to put stuff on it to make it heal to the other counselor.

-Harrsion K. stated that campers would be right in the cabin, just in the middle of the floor lined up; it would be all of the campers and other staff

-Harrison K. stated that there are two counselors to do the mosquito checks, "line one side of kids and the counselor with the brown hair (Plaintiff) would be next to us."

**COMPLAINT FOR DAMAGES**
28

-Harrison K. stated that the campers were wearing pajamas for the mosquito checks; "the counselor would check our legs and then if they didn't have any, they would go back to their bed." The legs were checked to the knee. He never checked anywhere else and Harrison K. stated that he never saw him check on anyone else much higher than that.

-Harrison K. stated that he never had to have the mosquito check when no one else was around.

-Harrison K. stated that he never saw anything at camp that made him feel uncomfortable; that nothing ever happened that he didn't like.

-Harrison K. stated that no one ever made him watch a movie or video where people had no clothes on.

Harrison K. did not testify at the grand jury. The police report stated only that on 11/5/12: "I spoke to Tish K. on the phone. She told me she spoke to her son Harrison K. on 11/1/12 regarding his interaction with Plaintiff at Walton's Grizzly Lodge during session 2 of 2011." Harrison K. told her Plaintiff did "mosquito checks" that involved checking his pants. As Harrison K. told Tish K. about the checks, he demonstrated by putting his own hand up the leg of his shorts. The following morning, she told him he could talk to her about anything that made him uncomfortable and he said that he did not want to return to Walton's Grizzly Lodge. Based on Harrison's statements, "I arranged for him to be interviewed at the Dallas Children's Advocacy Center on 1/2/13." The police report did not disclose the existence nor content of the

**COMPLAINT FOR DAMAGES**
29

interview at Dallas Advocacy Children's Center of Harrison K. which revealed exculpatory information. This information was concealed from the police report, from the prosecutor and from the grand jurors and undermined the confidence in the jury's findings.

Defendant HUMPHREY testified that he was familiar with Walton's Grizzly Lodge and based upon his investigation, there would be other counselors, staff or campers who if called here to to testify would testify that they had not observed any inappropriate behavior by Plaintiff towards male children.

Furthermore, he testified that there would be counselors, staff or campers that would testify that they had not observed any inappropriate conduct on behalf of Plaintiff during the tick checks.

Defendant intentionally and purposefully concealed reference to and content of the interview of Harrison K. from his police report and from the prosecutor so that the grand jurors were intentionally deprived of constitutionally mandated exculpatory information, and thereby due process and a fair trial that seriously and necessarily undermined confidence in the outcome of the grand jury proceeding. Grand jurors had numerous questions pertaining to the tick checks and the behavior of Plaintiff. They were deprived of the substance of numerous witnesses who could attest to the context and facts surrounding and actions taken during tick checks by Plaintiff. In totality, the effect of the inclusion of the unchallenged incidents severely prejudiced and influenced and undermines confidence in the grand jury's findings. The prosecutor was prevented from

## COMPLAINT FOR DAMAGES
30

adducing mandated material because she was not ignorant of its existence directly as the result of Defendants' intentional and purposeful concealment of the information contained within the undisclosed, non-referenced tapes and videotapes.

39.     The grand jury heard testimony from Mark C. as to tick checks where Plaintiff allegedly instructed him to pull his pants and underwear down and then touched his penis and butt, and also that Plaintiff manifested his sexual intent during "shower parties" in inappropriately touching minors in group shower times.  Witness William C. was in Mark's group and in Plaintiff's cabin during the relevant time period.  William C. described the tick checks much differently than Mark C.:  Counselor Stewart would check arms pits and nothing else.  William C. described Plaintiff's tick checks as he would normally check the legs and then open the waist band really fast, really quick.

On November 7, 2012, Defendant HUMPHREY and GARZA met with witness William C..  Said meeting was surreptitiously audiotaped.  The police report made no mention of the tape's existence nor of it's content and was not disclosed to the prosecutor and therefor neither to the grand jury. Counsel for Plaintiff received this tape on September 26, 2015, some 34 months after the recording and some eleven days after the commencement of Plaintiff's criminal trial.  Defendants intentionally and purposefully concealed this information from the prosecutor so that the grand jurors were intentionally deprived of constitutionally mandated exculpatory information, and thereby due process and a fair trial.  The tape documented the following assertions made by William C., a percipient witness:

**COMPLAINT FOR DAMAGES**
31

-William C. described shower parties: William never saw Plaintiff touch the genital area of any camper nor touch them inappropriately.

-William C. told defendants that there were a lot of kids that really liked Plaintiff, that he was nice. Particularly he thought Jake M. really liked Plaintiff. Defendant HUMPHREY stated to William C. that "He obviously went too far and did things he shouldn't have." This injected opinion and was an improper interviewing tactic. Defendant GARZA said that "he is going to be arrested, and that "we want to have a good case." Defendant did not disclose any reference to the interview of William C. in their police report. The only reference at the grand jury was by Defendant HUMPHREY who testified that he was familiar with Walton's Grizzly Lodge and based upon his investigation, there would be other counselors, staff or campers who if called here to to testify would testify that they had not observed any inappropriate behavior by Plaintiff towards male children. Furthermore, he testified that there would be counselors, staff or campers that would testify that they had not observed any inappropriate conduct on behalf of Plaintiff during the tick checks.

40. The grand jury received information regarding witness Garrett C. concerning the methods of bug checks. On November 6, 2012, Defendant HUMPHREY and GARZA met with witness Jake M.. Said meeting was surreptitiously audiotaped. Said tape was not provided to the prosecutor, nor to Plaintiff's criminal counsel until September 26, 2015, some 34 months after the meeting and some eleven days after the commencement of Plaintiff's criminal trial. Defendants intentionally and purposefully concealed this

information from the prosecutor so that the grand jurors were intentionally deprived of constitutionally mandated exculpatory information, and thereby due process and a fair trial.  Jake M. made assertions that:

        -during the 2011 summer session, Grant was his counselor and Robert was the low cub counselor, both groups had CILTS  and Plaintiff was in the cabin as the lo-cub counselor.

        - CILTS stayed in the cabin also (these would therefore be percipient witnesses).

        - counselors would check campers for bug bites and then put spray on them or that they would put spray on themselves.  He stated that the campers would line up. Grant was his counselor and he'd check his shirt and legs.  Plaintiff would also check campers, but usually campers were checked by their own counselor.  Jake M. stated in the tape that he knew that Plaintiff's checks were <u>no different than Grant's</u>.

        - he didn't feel uncomfortable with the bug checks; every kid was fine with it and that they thought it was routine.

        -no one ever checked his waistband as far as he could remember.  Nothing made him feel uncomfortable.  No one at camp or any counselors touched him on the private area.

        -during the shower party, all counselors and campers wore their bathing suits and that counselors did not put soap on the campers.

COMPLAINT FOR DAMAGES

33

- Plaintiff was really nice to him and he recalled that when he felt really homesick, Plaintiff made him feel comforted by letting him hang around with him around the camp walking around.  He was his favorite counselor.

41.    On November 7, 2012, Defendant HUMPHREY and GARZA met with witness Jake U. Said meeting was surreptitiously  audiotaped.  Said tape was not provided to the prosecutor, nor to Plaintiff's criminal counsel until September 26, 2015, some 37 months after the meeting and some eleven days after the commencement of Plaintiff's criminal trial.  Defendants intentionally and purposefully concealed this information from the prosecutor so that the grand jurors were intentionally deprived of constitutionally mandated exculpatory information, and thereby due process and a fair trial.  In particular, Jake U. made the following assertions:

- told Defendants at the outset of the interview that he felt he was there to discuss this "really weird creepy guy that was at our camp and that his new opinion was after he heard about "he is an idiot, I think he's really stupid".  Before hearing this though, Jake U. thought that Plaintiff was really nice.

- described the shower parties as they all wore bathing suits, they washed their own hair and brought their own shampoo.  There were curtains for every shower.

-stated that at the time of camp, he didn't feel "creeped out" by Plaintiff.  He thought he was really nice.

**COMPLAINT FOR DAMAGES**

34

-Plaintiff never looked at Jake's private part nor did he ever see Plaintiff look at the private parts of any other boys and finally, no one told him that Plaintiff creeped them out.

-The police report states only that "Jake and Paker U. both attended Session 4 of 2011. It should be noted Parker was never assigned to the same cabin as Plaintiff. They did not disclose any concerning behavior being done by Plaintiff."

42.    On November 7, 2012, Defendant HUMPHREY and GARZA met with witness PARKER U. Said meeting was surreptitiously taperecorded and audiotaped. Said tape was not referenced in the police report, provided to the prosecutor, nor to Plaintiff's criminal counsel until September 26, 2015, some 37 months after the meeting and some eleven days after the commencement of Plaintiff's criminal trial. Defendants intentionally and purposefully concealed this information from the prosecutor so that the grand jurors were intentionally deprived of constitutionally mandated exculpatory information, and thereby due process and a fair trial: PARKER U. told Defendants that when kids were homesick, Jeff would make them feel comfortable by telling them they would see their parent's soon. He did nothing that made Parker feel weird.

Det. Humphrey's Archive of Undisclosed Exculpatory Emails

43.    On October 25, 2012,, Defendant HUMPHREY received a moving and supportive letter from Riley Miller in support of Plaintiff, that he had worked under him and had been his camper for three years and had never observed anything inappropriate by Plaintiff toward himself or anyone. Said letter was not provided to the prosecutor, nor

COMPLAINT FOR DAMAGES
35

to Plaintiff's criminal counsel until September 24, 2015, some 35 months after receipt of

the email, and some nine days after the commencement of Plaintiff's criminal trial.

Defendants intentionally and purposefully concealed this information from the prosecutor

so that the grand jurors were intentionally deprived of constitutionally mandated

exculpatory information, and thereby due process and a fair trial

44.    Accusers from Walton's emerge only after issuance of press release-

Defendants concealed from the prosecutor the true facts, that the Mark C. and Garrett C.

complaints came forward as the result of, and only after the issuance of a viciously

slanderous press release that put Plaintiff in a false, predatory and  misleading light, in

particular that complaints of criminal acts had been received as of October 24, 2012 from

Lake Tahoe camp, and after that it had been "determined after a thorough investigation"

that Plaintiff had in fact committed sexual assaults on two boys in his class at El Segundo

Elementary School - Center Street.

In truth, on October 25, 2012, Defendant GARCIA and HUMPHREY were sent an email

by Walton's Grizzly Lodge pertaining to Plaintiff's arrest.  It contradicts the information

contained in the press release sent out by the El Segundo Police Department.  This was not

provided to the prosecutor and should have been brought to the attention of the grand jury as to

it's influence on the timing and source of complaints and the connection to the police press

release, in particular that the Lake Tahoe or other camp complaints had not come about

**COMPLAINT FOR DAMAGES**
36

independently.  This led to prejudicially false and misleading information being presented to the grand jury in two different exchanges:

FIRST EXCHANGE:

Q:     OKAY. AND WITH RESPECT TO YOUR INVESTIGATION, WHILE YOU WERE CONDUCTING THE INVESTIGATION THAT BEGAN WITH ISSUES AT CENTER STREET ELEMENTARY, DID YOU BEGIN TO RECEIVE INFORMATION FROM OTHER PEOPLE WITH RESPECT TO POTENTIAL ISSUES AT THE PAINTED TURTLE AND WALTON'S GRIZZLY CAMP AND — YEAH, THE PAINTED TURTLE AND WALTON'S GRIZZLY CAMP, DID YOU ATTEMPT TO GAIN INFORMATION FROM THEM?

A:     YES, I DID

SECOND EXCHANGE:

Q:  OKAY.  AND AT SOME POINT DID YOU ATTEMPT TO LOCATE OTHER POTENTIAL VICTIMS OR WITNESSES TO MR. SIMONEK'S BEHAVIOR?

A:     WE TRIED TO LOCATE A LOT OF ADDITIONAL VICTIMS OR WITNESSES BY A VARIETY OF DIFFERENT MEANS.

Q:     CAN YOU TELL US A LITTLE ABOUT WHAT YOU REMEMBER DOING?

A:     YES.  IT IF CAME TO LIGHT THAT HE HAD VOLUNTEERED AT A PLACE AT A PLACE WHERE CHILDREN WOULD HAVE BEEN PRESENT OR HE WOULD HAVE HAD ACCESS TO CHILDREN WOULD HAVE BEEN PRESENT OR HE WOULD HAVE HAD ACCESS TO CHILDREN, WE REACHED OUT TO THOSE PLACES.  WE REACHED OUT TO WALTON'S GRIZZLY LODGE, THE PAINTED TURTLE, BIG BROTHERS AND BIG SISTERS ORANGE COUNTY, A VARIETY OF PLACES HE HAD PUT ON HIS RESUME T HAT HE HAD WORKED WITH CHILDREN AND TO DETERMINE IF THEY HAD HAD ANY DOCUMENTED COMPLAINTS OR CONCERNS, AND ANYTHING THAT MIGHT HELP OUR INVESTIGATION.

**COMPLAINT FOR DAMAGES**

37

Q:     OKAY.  AND WITH RESPECT TO PARTICULARLY TO MARK C. AND GARRETT C., DID YOU SPEAK WITH THEM AFTER YOU HAD REACHED OUT TO MAKE CONTACT TO WALTON'S GRIZZLY LODGE?

A:     YES.

Q:     OKAY.  AND WITH RESPECT TO A MISS KATHLEEN FITZPATRICK AND ANOTHER CHILD THOMAS F., WHEN WAS IT THAT YOU FIRST HAD CONTACT FROM THEM?  WAS IT AFTER YOU HAD DONE SOMETHING?

A:     YES.

Q:     AND WHAT WAS THAT?

A:     AFTER—CAN YOU REPEAT THAT.

Q:     SURE.  WITH RESPECT TO KATHLEEN FITZPATRICK, WHO HAD GONE WITH HER CHILD SPENCER F. AND HER DAUGHTER, THEY HAD GONE TO THE PAINTED TURTLE AND INTERACTED WITH MR. SIMONEK AND ADDITIONALLY WITH RESPECT TO THOMAS F. AND HIS PARENTS, DID YOU MAKE CONTACT WITH THEM, PEOPLE WHO HAD GONE TO THE PAINTED TURTLE AFTER DOING SOMETHING?

DOES THAT MAKE ANYMORE SENSE?

A:     YES.  WELL, IF I REMEMBER CORRECTLY, THEY CONTACTED US AFTER SEEING A PRESS RELEASE.

Q:     IS THAT FOR BOTH FAMILIES?

A:     I BELIEVE SO, YES.

The testimony at the grand jury from DEFENDANT HUMPHREY was that he had received information from Mark C. and Garrett C. without mentioning them in relation to the timing of complaints to the issuance and distribution of the false press release.  The true facts were that Mark C. and Garrett C. came about as the result of the

**COMPLAINT FOR DAMAGES**
38

press release. These facts were concealed from the deputy district attorney and therefore from the grand jury. Furthermore, the Defendants GARCIA and HUMPHREY at all times knew and concealed that they caused additional press releases to be distributed by various parties, including Walton's Grizzly Lodge, South Bay Conservatory and Orange County Boys and Girls Club and made suggestions for editing and creating misleading and false press releases, specifically designed to influence the public and potential witnesses who had yet to be interviewed, this in reckless indifference to the rights and fairness to Plaintiff to receive a fair grand jury and other due process rights as guaranteed and clearly established in the federal and state constitutions.

Exculpatory Camp witness  Josh K. not disclosed

45.    On October 26, 2012, Defendants GARZA and HUMPRHEY received an email from the father of a former camper (Josh Kendall) of Plaintiff stating that the former camper reported that nothing untoward ever happened to him nor did he ever witness anything suspicious. Furthermore, it was reported to this father that Plaintiff was concerned and attentive to cleanliness. This information was concealed from the deputy district attorney and therefore from the grand jury and deprived the Plaintiff of a fair grand jury and due process and undermines confidence in the outcome of the grand jury. Josh had been in Plaintiff's group and cabin during 2008 during the same session as Stewart Gray.

Exculpatory Camp witness Charlie F. not disclosed

COMPLAINT FOR DAMAGES
39

46.     On October 25, 2012, Defendant HUMPHREY received an email from Charles Foster reporting the good character of Plaintiff. This information was not revealed to the deputy district attorney nor to the grand jurors nor to criminal defense counsel for Plaintiff until September 24, 2015. This was in reckless disregard to the clearly established constitutional rights of plaintiff to due process and a fair trial, including at the grand jury.

Defendant HUMPREY's Other Archived Undisclosed Exculpatory Information

47.     Defendant HUMPHREY archived other exculpatory information which was not disclosed:

a.      Witness name and contact information not disclosed to counsel for plaintiff- On October 25, 2012, Defendants HUMPHREY and GARZA received emails and information describing the name of another camper, Kyle B., who was percipient to the "tick checks" during the Mark C. session; he was his best friend. Defendants failed to include or reveal the full name of this percipient witness to the deputy district attorney in any police report, to the grand jurors or to Plaintiff until September 24, 2015 in reckless disregard to the clearly established rights of Plaintiff to a fair trial and due process, namely to know the names of the potential witnesses known to the Defendants. Furthermore, Defendants were aware of several prior inconsistent statements of witness Mark C. being reported by Mark's mother and failed to reveal these to deputy district attorney, in the police report or otherwise provide the information to the grand jurors, in

## COMPLAINT FOR DAMAGES
40

reckless indifference to the constitutional rights of Plaintiff and his right to due process and a fair trial.

   b. <u>The role and involvement of the police department was not disclosed</u>-On October 26, 2012, Defendant LT. GARCIA and Captain Turnbull exchanged emails indicating the personal supervisory role of the hierarchy of the El Segundo Police Department in overseeing the investigation against Plaintiff, together and along with his the direct and participating superior, Defendant GARZA.  This was not revealed until September 24, 2015 in reckless disregard to the clearly established rights of Plaintiff to a fair trial and due process.

   c. <u>Telephone conversation of disclosure of exculpatory information not revealed; impeachment not included:  plaintiff didn't touch Mark C.'s butt; impeachment of prior inconsistent statement</u>-On October 26, 2012, Defendant GARZA spoke telephonically with Jane C., parent of Mark C.  This information was documented in an email from Defendant GARZA to Ms. C. and was not revealed to the Deputy District Attorney in a police report or otherwise prior to the grand jury and not revealed to the Plaintiff until September 24, 2015 and thus not to the grand jurors, intentionally, purposefully, in bad faith and in reckless indifference to the rights of Plaintiff to a fair trial and due process.  During the conversation, Defendant GARZA was informed by Mark's mother of prior inconsistent statements of her son (scrotum, looked at his bottom) reported to her and that Plaintiff did not reportedly touch Mark's bottom.

      d.   <u>Defendant GARZA  injecting prejudicial opinion during interviews to</u>

<u>witnesses:</u>

      On October 26, 2012, Defendant GARZA communicated prejudicial opinion

during the investigation to a potential witness's father in response to his reporting that

Plaintiff had allegedly had little kids sit on his lap that his son was "rather astute because

this is a particular obsession of Simonek's and it may play a part in how he picks his

victims."  This investigatory tactic was purposely prejudicial, made in bad faith and was

recklessly indifferent to Plaintiff's right to have a fair grand jury, was not included

whatsoever in any police report nor otherwise communicated to the grand jury or to the

prosecutor that such interviewing statements were being made to potential witnesses so

the grand jurors could properly evaluate the statements received.  The grand jury was

deprived of essential information as to the methodology and inappropriate injection of

opinion throughout the investigation by the supervising Sgt, Defendant GARZA and

HUMPHREY. and was recklessly indifferent to Plaintiff's rights.  This information was

not disclosed to Plaintiff's counsel until September 24, 2015.

      e.   On October 28, 2012, Defendant HUMPHREY received information

from the President of the South Bay Conservatory in response to the newspaper release

naming South Bay Conservatory as a prior workplace of Plaintiff.  The President, Kay

Blanchard's, contact information or communication was never revealed in a police report,

to the grand jury nor to the deputy district attorney nor to Plaintiff until September 24,

**COMPLAINT FOR DAMAGES**
42

2015.  In response, SBC sent an email to the families explaining that they had learned that some children who heard about the arrest and had contacted a previous employee asking questions about the situation.  Moreover, no confirmed allegations surfaced according to the email.  This information was not revealed, in reckless disregard to the clearly established rights of Plaintiff.  Defendant HUMPHREY did not disclose that he had contacted South Bay Conservatory nor their response in flagrant and reckless indifference to the clearly established rights of plaintiff and deprived the grand jury of exculpatory information.  This concealment was purposeful, intentional, done in bad faith and deprived Plaintiff of valuable character witnesses.

       f.    <u>Defendant GARZA communicated improper opinion and facts about the investigation</u>-On October 26, 2012, DEFENDANT SGT. GARZA communicated to a potential witness from Center Street Elementary School that the Police Department had been "inundated" with phone calls and emails about the case.  This communication and tactic was not included in any police report, not communicated to the deputy district attorney nor to the grand jurors and therefore deprived the Plaintiff of his due process rights to a fair trial in reckless disregard to his clearly established rights.  Said repeated and unnecessary injection was done purposefully, intentionally and worked to potential witnesses against Plaintiff .

g.      <u>Defendant HUMPHREY skews press release to delete fact of</u>
<u>anonymous call as original basis of investigation; tells witness in writing that they had</u>
<u>confirmed they were victims of abuse (this is opinion and prejudicial)</u>-

On October 30, 2012, Defendant HUMPHREY sent an email to Kay Blanchard of

the South Bay Conservatory <u>recommending that she edit a pending press release to delete</u>

<u>that the investigation began as an anonymous complaint</u> and that they had confirmed with

victims that they were in fact abused.  This was prejudicial opinion by Defendant

HUMPHREY and was improperly communicated during the investigation at a critical

time and constituted a purposeful, intentional and bad faith tactic, made with reckless

indifference that constitutes a violation of Plaintiff's clearly established right to due

process and a fair trial.  This was not included in any police report, was not

communicated to the deputy district attorney nor therefore to the grand jurors and was

exculpatory and therefore deprived the Plaintiff of his rights.  This email was not

divulged to the Plaintiff until September 24, 2015.

h.      <u>Additional and subsequent press releases' content were not disclosed</u>
<u>in police reports or to grand jury and their content as potentially prejudicial and hearsay</u>-

On November 2, 2012, DEFENDANT HUMPHREY was informed of additional

informational releases distributed to camp families of Walton's Grizzly Lodge concerning

the progress of the investigation.  This was not provided in any police report, to the

deputy district attorney, nor to the grand jurors prior to their indictment, nor to the

**COMPLAINT FOR DAMAGES**
44

Plaintiff prior to September 24, 2012.  This was in reckless disregard to the clearly

established rights to due process and a fair trial owed to Plaintiff.  Its concealment and

suppression was done with purpose, intentionally and in bad faith as to Plaintiff's rights.

i.    Exculpatory witnesses divulged by Painted Turtle, not provided to

Plaintiff-On January 17, 2014, Blake Maher, Executive Director of The Painted Turtle

contacted Defendant HUMPHREY to communicate exculpatory information,

including that there was an insurance investigation underway regarding Tommy F., as

well as the names of several exculpatory witnesses.  DEFENDANT was aware and

concealed that Painted Turtle had been noticed of a claim by the Fladhammer family,

failed to provide this information in a police report, to the district attorney and to the

grand jurors.  This was puposeful, intentional and in bad faith, with reckless indifference

to the clearly established rights of Plaintiff to due process and a fair trial.

j.    Exculpatory interviews of Walton's campers occurred on or about

11/1/13 in Marin County prior to the grand jury and were not disclosed in police reports,

nor were the contents or statements made at that time disclosed-In or about November 1,

2013, Los Angeles County District Attorney and/or their representatives along with El

Segundo Police Defendants went to Marin county and proceeded to interview boys who

had attended Walton's Grizzly Lodge.  Interviews were conducted and exculpatory

information was revealed that was not disclosed to the grand jury, was not recorded in

any police report, was not revealed to the deputy district attorney and was not revealed to

COMPLAINT FOR DAMAGES

45

the Plaintiff. This was in reckless disregard for the clearly established rights of Plaintiff to due process and violated his right to a fair trial.

k.    Photos of alleged cabin crime scenes in possession of defendants not disclosed in police report nor described or provided-On November 14, 2012, Defendants HUMPHREY and GARZA each received email photographs of the interior of the cabin wherein Plaintiff was the cabin counselor, i.e., for Mark C. and Garrett C. allegations. The cabin photos clearly and unmistakably showed the bed configurations, the exculpatory nature of the physical layout, and said photos were in possession of both Defendant HUMPHREY and GARZA and was concealed throughout, not provided in any police report, not provided to the deputy district attorney, nor to the grand jury nor to the Plaintiff even when under oath by Defendant HUMPHREY. Only during the testimony of DETECTIVE GARZA on October 14, 2015 was it revealed that in fact both DEFENDANT Detective HUMPHREY and DEFENDANT GARZA were both in possession of cabin photographs, that were exculpatory. Defendant HUMPHREY had been directly asked at trial and he answered in the negative that he had such photos only to have been "cc'd" along with Defendant GARZA on November 14, 2012.

l.    Additional exculpatory evidence is outstanding, is yet to be disclosed, including at least 3 additional audiotapes that were inventoried but remain unidentified-On October 15, 2015 it was revealed that there still to this day are at least three (3) additional interview audiotapes or videotapes that have not yet been provided. It is believed that they are exculpatory and for this reason have not been produced.

**COMPLAINT FOR DAMAGES**
46

      m.    <u>Correspondence respecting contact information for campers was not</u>

<u>disclosed; it injected opinion and unnecessary and prejudicial information regarding the</u>

<u>progress</u> - On October 26, 2012, Defendant GARZA wrote a letter to Julie Stein

respecting an investigation seeking children from 2nd session, their name, parents,

address and contact phone numbers. This letter was not disclosed to the grand jury, to the

district attorney nor to the Plaintiff and explains the appearance of these additional

witnesses. The letters seeks to locate "additional victims" and hereby injects unnecessary

opinion.

      n.    <u>Previously requested but undisclosed handwritten notes reveal</u>

<u>additional witness who informed investigating officer that nothing happened with son</u>-

On November 15, 2012, Julie Stein sent to Defendant GARZA a listing of contact

information for the counselor and camper lists for the 2011 summer sessions. This was

divulged on October 14, 2015 during direct examination of Defendant GARZA in

Plaintiff's criminal case. Defendant GARZA nonetheless failed to document this list to

Plaintiff, in any police report or to provide this to the grand jury. It contains handwritten

notes, including a note that a message was left by mother of Session 2 lo cub (in Jeff's

group, in Mark's cabin). that on November 20, 2012, camper Aidan Cooper's parent

indicated that "nothing happened with son". This was an exculpatory witness which is

nowhere memorialized in any police report, was never told to the deputy district attorney

COMPLAINT FOR DAMAGES

47

nor brought to the attention of the grand jury, all with purpose and intent, bad faith and in reckless disregard for the constitutional rights of plaintiff to due process and a fair trial.

School District's Policy, Pattern and Practice

48.     Defendant EL SEGUNDO SCHOOL DISTRICT ("SCHOOL DISTRICT") is a governmental entity existing by virtue of the laws of the State of California.

49.     Defendant SCHOOL DISTRICT failed to train teachers, particularly older teachers, that there should be no different standard based on a teacher's gender or sexual preference.

City's Failure to Train Officers

50.     Defendant CITY failed to train officers to disclose Brady material.  In or about October 24, 2012, several mothers appeared at the El Segundo Police Department to provide character evidence in support of Plaintiff, and also in support as percipient mothers to children who were tutored and otherwise in proximity to Plaintiff.  Defendant TAVERA and ATKINSON greeted said potential witnesses with bias, negativity, discouragement and belittlement, providing prejudicial response to Plaintiff's rights and tampered with these witnesses.  Said Defendant CITY's failed to train it officers is exemplified by the Chief of Police's failure to disclose the fact of the meetings with mother's of children who came forward to Plaintiff's defense and provided exonerating information, only to be rebuffed by the Chief who (1) gave conclusory and biased, false and uncorroborated opinion that Plaintiff was guilty, and (2) failed to provide information received from these mothers to the prosecutor with the exonerating information, i.e.,

statements of exonerating character witnesses of Peggy B.(the subject of the second subject of the DCFS complaint); Lisa B. (mother of David B, percipient witness); Mindi R. (Mother of tutored child); and Dale B. (Mother of tutored child and child who went on extracurricular trips with Plaintiff).

Citizen Defendant's Actions

51.     Defendants Greg B. and Kelly B. are individuals. These defendants gave police deliberately false information that their son, Ethan B., had been molested by Plaintiff, and instructed and encouraged their son to falsely testify and themselves provided falsified testimony. In doing so, these Defendants, in having knowledge that the police defendants were depriving Plaintiff of his constitutional rights, as previously alleged, thereby impliedly conspired with police to cause said deprivation of constitutional rights, as alleged below.

# FIRST CAUSE OF ACTION

# FOR VIOLATION OF CIVIL RIGHTS

(42 U.S.C. § 1983)

(Against Individual Police Officers)

52.     Plaintiff incorporates by reference each of the allegations in paragraphs 1 through 51 as though set forth fully herein.

53.     Defendants, individually and in concert, maliciously conspired against Plaintiff to bring charges of lewd conduct in violation of California Penal Code Section 288(a), and on November 26, 2013 Defendants caused Plaintiff's arrest.

**COMPLAINT FOR DAMAGES**
49

54.    Defendants knew that these charges were completely and utterly unsupported by probable cause, were a total fabrication, and were contradicted by evidence, other witnesses, and even the accusers. In their rush to accuse, Defendants purposefully, intentially, willfully and in bad faith ignored and were deliberately indifferent to overwhelming evidence of Plaintiffs' actual innocence.

55.    Defendants actions were motivated by express animus towards gays and particularly male gays.

56.    Defendants used the accuser's inconsistent and demonstrably false allegations as the fuel for a campaign to obtain an indictment in Los Angeles Superior Court Case No. BA414899 against Plaintiff.

57.    With little or no evidence that plaintiff had actually committed a crime, Defendants set about to fabricate such evidence. And, when evidence threatened to expose the truth by reaffirming that the accusers were not telling the truth and that no crime had occurred, Defendants conspired to conceal this exculpatory evidence in order to charge and convict the Plaintiffs on "facts" they knew to be untrue. Defendants' actions evidenced a purposeful, intentional, and bad faith reckless and callous disregard for and deliberate indifference to Plaintiff's constitutional rights and Defendants' responsibilities to the criminal justice system.

58.    Defendants, and each of them, did the acts and omissions, hereinafter alleged, in bad faith and with knowledge that their conduct violated well established and

**COMPLAINT FOR DAMAGES**
50

settled law. In doing so defendants did the following acts, in addition to foregoing alleged acts:

      (a)    Suppressed exculpatory evidence, including, but not limited to, recordings of an interviews showing Plaintiff was innocent, recordings showing that accusing teachers were motivated by sexual-preference bias, particularly against males, recordings showing that those students and parents who accused Plaintiff were being motivated by such gay bias, other evidence bearing on witness credibility, all of which constituted Brady evidence, required to be disclosed under Constitutional standards;

      (b)    Suppressed exculpatory evidence, which was known to Defendants prior to the grand jury hearing, thereby deprived Plaintiff of his constitutional right to a fair grand jury hearing;

      (c)    Employed police tactics in violation of police standards, to influence potential witnesses to generate untruthful testimony by providing such potential witnesses with fabricated information painting Plaintiff as a vile individual, which would likely create a hatred and bias against Plaintiff, thereby tainting and improperly influencing witness; and

      (d)    In suppressing exculpatory evidence known by defendants prior to the grand jury hearing, Defendants acted in manner which they knew would which caused the grand jury to return multiple counts of violations of law, and thereby cause Plaintiff's

**COMPLAINT FOR DAMAGES**

51

bail to be raised to the amount of $20,000,000, effectively depriving Plaintiff of his constitutional right to bail, and cause him to languish in jail for years.

59.    As a result of Defendants' actions, Plaintiff has suffered deprivations of the rights guaranteed to him under the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States and Article 1, Section 7 of the California Constitution; has suffered economic, emotional, and physical harm; he has suffered irreparable harm to his reputation; and has incurred thousands of dollars in legal fees defending himself against criminal prosecution.

## SECOND CAUSE OF ACTION

## FOR FAILURE TO TRAIN

### (42 U.S.C. § 1983)

(Against the CITY OF EL SEGUNDO and EL SEGUNDO POLICE DEPARTMENT, MITCH TAVERA)

60.    Plaintiff incorporates by reference each of the allegations in paragraphs 1 through 59 as though set forth fully herein.

61.    Defendant CITY is and at all times herein mentioned has been a public entity and an incorporated municipality duly authorized and existing as such in and under the laws of the State of California; and at all times herein mentioned, Defendant CITY, possessed the power and authority to train its police officers in the proper investigation and handling of cases if alleged child abuse, and had a duty to so train police officer.

62.    At all times herein mentioned, Defendants, and each of them, were

**COMPLAINT FOR DAMAGES**
52

employees acting under the CITY's direction and control, who knowingly and

intentionally withheld exculpatory evidence, as more particularly alleged above, and used

tactics during their investigation which were calculated to cause hatred and bias against

Plaintiff, cause hysteria among children and parents, and which would thereby cause

potential witnesses to provide untrue, inaccurate, exaggerated, or false evidence.

63.    Prior to and continuing through much of the criminal trial, Plaintiff was

deprived if information demonstrating said lack of training of HUMPHREY.

64.    Defendant CITY failed to properly train Defendant HUMPHREY, who

Defendant CITY knew "was assigned 99% of the child abuse cases cross-referenced to

the Police Department" to comply with the duty to provide all discovery, Brady

discovery, and to conduct unbiased, investigation without depriving the Plaintiff of the

presumption of innocence and due process and rights to a fair grand jury hearing and fair

trial, to interview witnesses in a manner avoiding cross-contamination, witness

suggestibility, and rumor mongering, and to detect motives and biases so as to ensure fair

trial.

65.    As a result of Defendants' actions, Plaintiff has suffered deprivations of the

rights guaranteed to him under the Fourth, Fifth, Eighth and Fourteenth Amendments to

the Constitution of the United States and Article 1, Section 7 of the California

Constitution; has suffered economic, emotional, and physical harm; has suffered

irreparable harm to his reputation; and has incurred thousands of dollars in legal fees

defending himself against criminal prosecution.

**COMPLAINT FOR DAMAGES**
53

## THIRD CAUSE OF ACTION

## FOR FAILURE TO SUPERVISE

### (42 U.S.C. § 1983)

(Against the CITY OF EL SEDUNGO and EL SEGUNDO POLICE DEPARTMENT,

MITCH TAVERA)

66.    Plaintiff incorporates by reference each of the allegations in paragraphs 1 through 65 as though set forth fully herein.

67.    Defendant CITY is and at all times herein mentioned has been a public entity and an incorporated municipality duly authorized and existing as such in and under the laws of the State of California; and at all times herein mentioned, Defendant CITY, possessed the power, authority, and duty to supervise police officers in the proper investigation and handling of cases of alleged child sexual abuse.

68.    At all times herein mentioned, Defendants, and each of them, were employees acting under the CITY's direction and control, who knowingly and intentionally withheld exculpatory evidence, as more particularly alleged above, and used tactics during their investigation which were calculated to cause hatred and bias against Plaintiff, cause hysteria among children and parents, and which would thereby cause potential witnesses to provide untrue, inaccurate, exaggerated, or false evidence. Prior to said criminal trial,

69.    Plaintiff was deprived of information demonstrating said lack of supervision by CITY of DefendantsHUMPHREY, GARZA, ATKINSON, GARCIA and TAVERA.

COMPLAINT FOR DAMAGES
54

70.     Defendant CITY failed to supervise Defendant HUMPHREY, who Defendant CITY knew "was assigned 99% of the child abuse cases cross-referenced to the Police Department" to comply with the duty to provide all discovery, Brady discovery, and to conduct unbiased, investigation without depriving the Plaintiff of the presumption of innocence and due process and rights to a fair grand jury hearing and fair trial, to interview witnesses in a manner avoiding cross-contamination, witness suggestibility, and rumor mongering, and to detect motives and biases so as to ensure fair trial.

71.     As a result of Defendants' actions, Plaintiff has suffered deprivations of the rights guaranteed to him under the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States and Article 1, Section 7 of the California Constitution; has suffered economic, emotional, and physical harm; they have suffered irreparable harm to his reputation; and has incurred thousands of dollars in legal fees defending themselves against criminal prosecution.

## FOURTH CAUSE OF ACTION

## FOR CONSPIRACY TO DEPRIVE EQUAL PROTECTION

### (42 U.S.C. § 1985 (2))

(Against All Individual Police Defendants)

72.     Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 71 of this complaint, and by this reference incorporates the same herein and makes each a part hereof.

**COMPLAINT FOR DAMAGES**

55

73.     The individual police Defendants and two or more of them, in the State of California, County of Los Angeles, by reason of Defendants' animus against gay persons and males of which class Plaintiff belongs, invidiously discriminated and conspired together to act and to fail to act as hereinbefore alleged, causing Plaintiff's arrest on November 26, 2015, for the purpose of impeding, hindering, obstructing, and defeating the due course of justice in the State of California and County of Los Angeles.

74.     Defendants, and each of them, purposefully, under color of law, planned and conspired to deny Plaintiff equal protection of the laws by (a) suppressing evidence as more particularly alleged above, (b) causing the deprivation of a fair grand jury hearing, (c) effectively causing loss of the right to bail, and (d) denying the right not to be deprived of liberty without due process of law, (e)

75.     By reason of the foregoing, Defendants, and each of them, violated 42 U.S.C. § 1985 (2) and 42 U.S.C. sections 1983.

76.     As a direct and proximate result of the foregoing, Plaintiff has been damaged by the loss of liberty. Plaintiff has suffered the loss of liberty, shame, hurt feelings, mental and emotional distress, and other general and special damages according to proof.

Further, Plaintiff is entitled to punitive damages except as to Defendant CITY, and is entitled to an award of attorney's fees.

## FIFTH CAUSE OF ACTION

## FOR CONSPIRACY TO DEPRIVE EQUAL PROTECTION

## COMPLAINT FOR DAMAGES
56

(42 U.S.C. § 1985 (2))

(Against All Individual Citizen Defendants)

77.     Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 76 of this complaint, and by this reference incorporates the same herein and makes each a part hereof.

78.     Commencing in approximately October, 2012 and continuing thereafter, the individual Defendants GREG B. and KELLY B., knew of the individual police Defendants' animus against gay persons, of which class Plaintiff belongs, and further knew that they were invidiously discriminating and conspiring to act as hereinbefore alleged, for the purpose of impeding, hindering, obstructing, and defeating the due course of justice in the State of California and County of Los Angeles.

79.     Defendants BURNER, and each of them, with said knowledge, impliedly and expressly planned and conspired with the individual police to deny Plaintiff equal protection of the laws

80.     By reason of the foregoing, Defendants, and each of them, violated 42 U.S.C. § 1985 (2) and 42 U.S.C. section 1983.

81.     As a direct and proximate result of the foregoing, Plaintiff has been damaged by the loss of liberty. Plaintiff has suffered the loss of liberty, shame, hurt feelings, mental and emotional distress, and other general and special damages according to proof. Further, Plaintiff is entitled punitive damages and attorney's fees.

COMPLAINT FOR DAMAGES
57

## SIXTH CAUSE OF ACTION

## FOR TO DEPRIVE EQUAL PROTECTION

### (42 U.S.C. § 1985 (2))

### (Against the El Segundo School District and DOES)

82.     Plaintiff refers to and re-pleads each and every allegation contained in paragraphs 1 through 81 of this complaint, and by this reference incorporates the same herein and makes each a part hereof.

83.     Defendant SCHOOL DISTRICT operates a system of schools within its district, including Center Street Elementary School.

84.     At all times alleged herein, and for a number of years prior to the events alleged herein, there existed among the SCHOOL DISTRICT employees, including officers, administrators, managers, principals, and teachers, a rampant pattern and practice of bias towards gay teachers, and especially male gay teachers.

85.     The SCHOOL DISTRICT, having the information that such bias existed in the degree that it did, failed to take the action of training its employees to not discriminate against its male gay teachers, and to treat this class of teachers the same as other teachers who interact with students in a manner that brings the teacher in close proximity to the student and which results in incidental contact.

86.     In failing to so train its employees, the SCHOOL DISTRICT thereby encouraged and caused certain teachers at the El Segundo Elementary School to become

COMPLAINT FOR DAMAGES

58

angry at and intolerant of, in the weeks prior to August 1, 2012, at the prospect that Plaintiff would be hired as school teacher from a pool of previously employed teacher assistants. On August 1, 2012, on the date that Plaintiff was hired as a full teacher, the SCHOOL DISTRICT's failure to so train further encouraged and caused said certain teachers to purposely falsely accuse Plaintiff of having improperly touched male children, and encouraged and caused these teachers to then pressure certain parents to encourage their children, students of Plaintiff, to falsely accuse Plaintiff of touching their genitals and otherwise improperly touching them.

87.    The SCHOOL DISTRICT failure to so train was a foreseeable and substantial factor in causing Plaintiff's arrest and prosecution as set forth above. Plaintiff has suffered the loss of liberty, shame, hurt feelings, mental and emotional distress, and other general and special damages according to proof.

## SEVENTH CAUSE OF ACTION

## FOR MALICIOUS PROSECUTION

(Against Greg B. and Kelly B.)

88.    Plaintiff incorporates by reference each of the allegations of paragraphs 1 through 87 as though set forth fully herein.

89.    Greg B. and Kelly B. were actively involved in causing Plaintiff to be prosecuted for lewd conduct on a child in violation of Penal Code Section 288(a), and were actively involved in the maintaining the action through trial. In particular, these

## COMPLAINT FOR DAMAGES
59

defendants gave police deliberately false information that their son, Ethan B., had been molested by Plaintiff, and instructed and encouraged their son to falsely testify.

90.    The criminal proceeding ended in plaintiff's favor.

91.    No reasonable person in defendants Greg B. and Kelly B. circumstances would have believed that there were grounds for causing Plaintiff to be arrested or prosecuted.

92.    Defendants acted primarily for a purpose other than to bring Plaintiff to justice and instead acted out of animus toward gay persons.

93.    Plaintiff was harmed by the prosecution. Plaintiff has suffered the loss of liberty, shame, hurt feelings, mental and emotional distress, and other general and special damages according to proof.

94.    Defendants' conduct was a substantial factor in causing Plaintiff's harm and in fact did cause harm to Plaintiff.


WHEREFORE, Plaintiff prays judgment as follows:

1.    General damages;

2.    Special damages;

3.    Punitive damages;

4.    Costs of suit;

5.    Attorney fees;

6.    Such other and further relief as the court deems just and proper.

**COMPLAINT FOR DAMAGES**

60

Dated: November 15, 2015          LAW OFFICES STEFFENY HOLTZ

Steffeny Holtz,
Attorney for Plaintiff,
JEFFREY SIMONEK

**COMPLAINT FOR DAMAGES**
61

## DEMAND FOR JURY TRIAL

Plaintiff JEFFREY SIMONEK hereby demands a jury trial in the above-

captioned matter.

Dated: November 15, 2015         LAW OFFICES STEFFENY HOLTZ

Steffeny Holtz,
Attorney for Plaintiff,
JEFFREY SIMONEK

**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

JEFFREY SIMONEK

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

CITY OF EL SEGUNDO, et al.

**(b) County of Residence of First Listed Plaintiff** LOS ANGELES
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant LOS ANGELES
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

STEFFENY HOLTZ, ESQ
LAW OFFICE OF STEFFENY HOLTZ
880 APOLLO STREET #229
EL SEGUNDO, CA 90245   323-864-3227

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding   ☐ 2. Removed from State Court   ☐ 3. Remanded from Appellate Court   ☐ 4. Reinstated or Reopened   ☐ 5. Transferred from Another District (Specify)   ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ According to Proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

42 U.S.C. 1983

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property |  | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** |  | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **TORTS** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation |  | ☐ 310 Airplane | **PERSONAL PROPERTY** | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV |  | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts |  | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other |  |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | **LABOR** |  |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☒ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act |  |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations |  |
|  | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act |  |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure |  | ☐ 443 Housing/ Accommodations | ☐ 751 Family and Medical Leave Act |  |
|  | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation |  |
|  |  |  | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act |  |
|  |  |  | ☐ 448 Education |  |  |

**FOR OFFICE USE ONLY:**   Case Number:   CV15-9190

CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.?  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)  *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| D.1. Is there at least one answer in Column A? | D.2. Is there at least one answer in Column B? |
|---|---|
| ☐ Yes  ☒ No | ☐ Yes  ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. | If "yes," your case will initially be assigned to the EASTERN DIVISION. |
| Enter "Southern" in response to Question E, below, and continue from there. | Enter "Eastern" in response to Question E, below. |
| If "no," go to question D2 to the right. ➡ | If "no," your case will be assigned to the WESTERN DIVISION. Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | WESTERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

CIVIL COVER SHEET

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____  DATE: November 25, 2015

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

CV-71 (10/14)   CIVIL COVER SHEET   Page 3 of 3